IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., <br><br> Plaintiff; <br><br> v. <br><br> CEQUEL COMMUNICATIONS, LLC D/B/A SUDDENLINK COMMUNICATIONS AND CSC HOLDINGS, LLC D/B/A OPTIMUM-CABLEVISION, <br><br> Defendants. | Civil Action No. 18-1752-RGA |

## MEMORANDUM OPINION

Stephen J. Kraftschik, Christina B. Vavala, POLSINELLI PC; B. Trent Webb, Aaron E. Hankel, John D. Garretson, Ryan J Schletzbaum, Ryan D. Dykal, Jordan T. Bergsten, Lauren E. Douville, Mark D. Schafer, Maxwell C. McGraw, Samuel J. LaRoque, Lydia C. Raw, SHOOK, HARDY & BACON L.L.P., Kansas City, MO; Robert H. Reckers, Michael W. Gray, Jonathan M. Hernandez, SHOOK, HARDY & BACON L.L.P, Houston, TX;

 Attorneys for Plaintiff.

Frederick L. Cottrell, III, Jason J. Rawnsley, Alexandra M. Ewing, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Brian C. Swanson, Tulsi E. Gaonkar, Luke C. Beasley, BARTLIT BECK LLP, Chicago, IL; Lindley J. Brenza, Sean C. Grimsley, BARTLIT BECK LLP, Denver, CO;

 Attorneys for Defendants.

February 4, 2022

1



ANDREWS, U.S. DISTRICT JUDGE:

Before me is Defendants' *Daubert* motion to exclude evidence from Dr. Mangum and Dr. Wicker. (D.I. 247). I have considered the parties' briefing. (D.I. 248, 275, 296). For the following reasons, Defendants' motion is GRANTED-IN-PART and DENIED-IN-PART.

**I.  BACKGROUND**

Plaintiff Sprint sued Defendants Cequel Communications, LLC d/b/a Suddenlink Communications ("Suddenlink"), CSC Holdings, LLC d/b/a Optimum-Cablevision ("Cablevision"), and Altice USA, Inc.[1] for infringement of various patents related to telecommunications technology. (D.I. 1). Only seven of the patents-in-suit are relevant to Defendants' present motion: U.S. Patent Nos. 6,452,932 ("the '932 Patent"), 6,463,052 ("the '052 Patent"), 6,633,561 ("the '3,561 Patent"), 7,286,561 ("the '6,561 Patent"), 6,343,084 ("the '084 Patent"), 6,473,429 ("the '429 Patent"), 6,298,064 ("the '064 Patent") (collectively the "Christie patents"). (D.I. 248 at 2). These patents all expired May 5, 2014. (D.I. 276-1, Ex. A ¶ 95).

The asserted patents reflect the changing technological landscape of telecommunications. Towards the end of the twentieth century, nearly all phone calls were carried over the "copper wire and complex switches" of the Public Switched Telephone Network ("PSTN"). (D.I. 1 ¶ 11; D.I. 249-1, Ex. A ¶ 30). With the rise of the computer came new ways of thinking about transmitting phone calls. (D.I. 1 ¶ 12). "Computers communicated with each other using 'packets' of data." (*Id.*). So too could voice data from phone calls. The new technology had significant efficiencies but suffered from a major stumbling block: It was incompatible with the legacy PSTN system. (*Id.*).

---

[1] At present, only Suddenlink and Cablevision remain as defendants. (*See* D.I. 16).

The Christie patents stem from Joe Christie's work to solve this problem. (*Id.* ¶¶12-16). "Mr. Christie invented a series of architectures, components, and processes that would allow the PSTN to 'talk' to packet-based networks to set up and route telephone calls across these disparate networks in a seamless and transparent manner." (*Id.* ¶ 13). This "Voice-over-Packet" ("VoP") technology provided the bedrock for other technologies such as Voice over Internet Protocol ("VoIP") that similarly allows for calls between the legacy PSTN system and newer packet-based data networks. (D.I. 249-1, Ex. A ¶ 30).

Defendants are cable companies that utilize VoIP networks to provide voice services to customers. (D.I. 248 at 2). This is not Sprint's first lawsuit enforcing the asserted patents. (D.I. 1 ¶¶ 17-20; *see also Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, 2021 WL 979307 (D. Del. Mar. 16, 2021) (considering a previous challenge to Sprint's experts Dr. Wicker and Dr. Mangum)). Defendants challenge only Dr. Mangum's damages calculations regarding Cablevision's Optimum and Lightpath networks. (D.I. 248 at 2). Suddenlink is not accused of infringing the Christie patents. (*Id.* at 3).

## II. LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[2]

## III. DISCUSSION

### A. Lost Profits

Dr. Mangum opines that Sprint is entitled to lost profits under the *Panduit* factors. "The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc). Dr. Mangum's expert report addresses each factor, describing demand for wholesale VoIP (D.I. 276-1, Ex. A ¶¶ 62-65), the absence of

---

[2] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

noninfringing wholesale VoIP providers (*Id.* ¶¶ 66-78), Sprint's capacity to provide VoIP to Cablevision (*Id.* ¶¶ 79-83), and Sprint's lost profits (*Id.* ¶¶ 85-91).

Cablevision argues that I should exclude Dr. Mangum's opinion on lost profits for three reasons. First, Cablevision argues that Dr. Mangum's opinion fails to show causation because Cablevision and Sprint do not provide products that serve as substitutes in the market. Second, Cablevision attacks Dr. Mangum's opinion on noninfringing alternatives. Third, Cablevision argues that Dr. Mangum has failed to apportion the value of non-patented services. For the following reasons, I do not find Cablevision's arguments persuasive.

### 1. Causation

Cablevision asserts that Dr. Mangum's opinion on lost profits is inconsistent with the *Panduit* test, which "requires that the patent owner and alleged infringer 'sell products sufficiently similar to compete against each other in the same market segment.'" (D.I. 248 at 4 (quoting *BIC Leisure Prods., Inc. v. Windsurfing Intern., Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993))). Cablevision sells services directly to retail customers, while Sprint sells wholesale VoIP services to companies like Cablevision. There is no hypothetical world in which Sprint would be making Cablevision's sales.

Sprint paints a different picture of the relevant products and the relevant market. "[B]ut for its infringement, Cablevision would have purchased Sprint's patented wholesale VoIP service . . . ." (D.I. 275 at 2). The product, according to Sprint, is wholesale VoIP services. The consumer is Cablevision. Cablevision's in-house development of VoIP is a substitute for Sprint's VoIP services. The lost sale, in short, is a sale from the patentee to the defendant.

5

Both parties point to *WesternGeco L.L.C. v. ION Geophysical Corp.* in support of their position. (*See* D.I. 275 at 4, D.I. 296 at 1-2 (citing 913 F.3d 1067 (Fed. Cir. 2019))). In *WesternGeco*,

> Both WesternGeco and ION domestically manufacture devices, the Q-Marine and DigiFin respectively, for steering streamers in marine seismic surveys. WesternGeco does not sell its device, instead using it to perform surveys abroad for oil companies. ION does not perform surveys, instead supplying its device to customers who perform the surveys abroad.

913 F.3d at 1070. The Federal Circuit rejected ION's argument that there is a "direct competition" requirement for lost profits under *Panduit*. *Id.* at 1072. The question is whether "the patent owner's and the infringer's *products* are adequate substitutes for consumers in a particular market." *Id.* at 1073. In *WesternGeco*, "there was sufficient evidence in the record for the jury to conclude that the products did compete—i.e., that consumers in the surveying market (oil companies) considered WesternGeco's Q-Marine device and ION's DigiFin device to be substitutes for their surveying needs (i.e., that the products competed in the same market)." *Id.*

Here, Dr. Mangum has articulated the ways in which a company like Cablevision would consider Sprint's wholesale VoIP services and an in-house option as substitutes. Dr. Mangum's report discusses how Suddenlink, the other Defendant in the present case, considered its own in-house option as an alternative to Sprint's wholesale services. (D.I. 276-1, Ex. A ¶¶ 41-49). Cablevision directs me to caselaw that talks about the patentee recovering the "infringer's sales." *BIC Leisure*, 1 F.3d at 1218. Here, in contrast, Cablevision's in-house VoIP services were not sold on the market. (D.I. 296 at 2). *BIC Leisure* reflects a different factual background. Other cases affirm, "A showing under the four-factor *Panduit* test establishes the required causation." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013). Dr. Mangum has put forward an analysis under the *Panduit* factors that supports his theory of a lost sale from

6

patentee to defendants. I do not see why the caselaw cannot support this theory. At least one other court has agreed. *Devon Distrib. Corp. v. Miner*, 331 F. Supp. 2d 791, 797-99 (S.D. Iowa 2004) ("The Court finds that in the event a finding of infringement is made, the 'lost profits' that could reasonably be supported here are no more than what Plaintiff would have made by selling Defendants an additional machine or machines or by selling Defendants a license to use the allegedly infringing machines.").[3]

### 2. Availability of Noninfringing Alternatives

Cablevision contends that Dr. Mangum's analysis fails to account for certain available noninfringing alternatives. (D.I. 248 at 6-13).

Cablevision argues that Cablevision's customers, the retail consumers, had noninfringing alternatives to VoIP. (*Id.* at 6). I find this irrelevant. Under Dr. Mangum's theory, Cablevision is the relevant consumer, not Cablevision's retail customers.

Cablevision's more serious contention is that Dr. Mangum "has no reliable basis for assuming away" two noninfringing alternatives: Sprint's wholesale competitors and Cablevision's circuit-switched Lightpath network. (*Id.*).

Regarding Sprint's wholesale competitors, Dr. Mangum opines, "[I]t is my understanding that using an unlicensed provider . . . would still infringe Sprint's patents under Dr. Wicker's analysis." (D.I. 276-1, Ex. A ¶ 75). Cablevision argues that Dr. Mangum's reliance on Dr. Wicker's opinions is faulty. (D.I. 248 at 7). For instance, Dr. Mangum cites to a conversation he had with Dr. Wicker in which Dr. Wicker described the relevant patents as "blocking patents." (*Id.* (citing D.I. 276-1, Ex. A ¶ 95 & n.169)). Cablevision argues, "Dr. Wicker's assertions about

---

[3] I previously had the opportunity to reject an argument similar to Sprint's, but did not do so. *Manufacturing Resources Int'l, Inc. v. Civiq Smartscapes, LLC*, 2019 WL 4198194, at * 3-4 (D.Del. Sept. 4, 2019).

7

'blocking' patents are, by his own admission, not based on any technical analysis and should be excluded, as should Dr. Mangum's reliance on them." (D.I. 248 at 8). Cablevision's motion specifically sought to exclude "expert testimony offered by Dr. Stephen Wicker's (sic) that the Asserted Patents are 'blocking patents.'" (D.I. 247). Oddly, Sprint does not mention Dr. Wicker's "blocking patents" opinion in its briefing (D.I. 275), which would be a waiver if Dr. Wicker had disclosed such an opinion. But it appears the reason for the non-response is that Dr. Wicker has not "explicitly" offered a blocking patent opinion in his expert reports (D.I. 248 at 7 (citing Dr. Wicker's deposition testimony, D.I. 249-2, Ex. L at 253:15-21)). Thus, Dr. Wicker is precluded from offering an opinion not in his expert report, and Dr. Mangum cannot rely upon a technical opinion that Dr. Wicker has not actually disclosed and therefore is precluded from relying upon the undisclosed opinion.

The "blocking patents" conversation is not Dr. Mangum's sole support for his understanding that unlicensed providers would still infringe Sprint's patents. Dr. Mangum also cites a Memorandum and Order from *Sprint Communications Co. v. Cable One, Inc*, Dr. Wicker's previous 2015 expert report from *Sprint v. Comcast*, and the opinion offered by Dr. Wicker in the present case. (D.I. 276-1, Ex. A ¶ 75 n.141 (incorporating n. 98)). It is true, as Cablevision asserts, that Dr. Wicker's opinion on the lack of non-infringing alternatives in the present case is conclusory.[4] (*See* D.I. 276-1, Ex. C ¶ 320-21 ("Based upon the information currently available to me, however, use of a third party to perform some (or all) method steps

---

[4] On this point, Sprint argues that Cablevision "failed to identify any particular non-infringing third-party VoIP provider during discovery." (D.I. 275 at 10; *see also* D.I. 276-1, Ex. C ¶ 320). In short, a vague interrogatory response yielded an unsupported expert opinion. Because I agree with Sprint on other grounds, I do not need to resolve this issue.

does not avoid infringement: Defendants cannot avoid the reach of Sprint's patents by controlling or directing another to infringe at their behest.").

I find, however, that Dr. Mangum can base his opinion on the specifically identified opinions of Dr. Wicker in prior Sprint lawsuits. "As Dr. Mangum points out in his report, Dr. Wicker opined in the *Sprint v. Cable One* case that Cable One's use of unlicensed VoIP provider Level 3 infringes Sprint's patents, and Cable One's motion for summary judgment of no infringement was denied before that case settled."[5] (D.I. 275 at 8). Dr. Wicker's opinions in *Cable One* are relevant in this case because Dr. Wicker opines on the same patents in the same market context. Sprint produced Dr. Wicker's *Cable One* opinion during discovery. (D.I. 275 at 8; D.I. 315 at 1). Cablevision was on notice of Dr. Wicker's opinions on unlicensed wholesale VoIP providers. Dr. Mangum's reliance on Dr. Wicker's expert opinions in *Cable One* do not pose a *Daubert* problem.

Cablevision also attacks Dr. Mangum's treatment of circuit-switched telephony under *Panduit* factor 2. (D.I. 248 at 9-10). Cablevision argues that Cablevision's circuit-switched Lightpath network was a viable noninfringing alternative and Dr. Mangum's analysis suggesting the contrary is wrong. (*Id.*). Dr. Mangum concludes that circuit-switched telephony was not an available noninfringing alternative because (1) "it is significantly more expensive than VoIP," (2) no cable company "deployed and maintained circuit-switched telephony across its entire footprint," and (3) witness testimony from both Cablevision and Suddenlink suggested that the companies either rejected or never considered offering circuit-switched telephony. (D.I. 276-1, Ex. A ¶¶ 64, 68-73).

---

[5] Dr. Mangun cannot rely on the *Cable One* Court's opinion and order. Denial of a summary judgment motion is an irrelevant fact in this context.

9

Cablevision contests Dr. Mangum's first assertion—that it would have been significantly more expensive to Cablevision to deploy a circuit-switched network. (D.I. 248 at 10). Cablevision argues that Dr. Mangum has both (1) failed to account for the (relatively low) cost to Cablevision of deploying a circuit-switched network and (2) underestimated the cost to Cablevision of using Sprint's VoIP services. Of course, if Cablevision is right, and the cost of using the Lightpath network was lower than (or close to) the cost of using Sprint's wholesale VoIP services, the use of the Lightpath network would have been a more attractive option for Cablevision and more likely a viable noninfringing alternative.

Sprint responds that Dr. Mangum's calculations are reliable. "Dr. Mangum looked at a broad variety of sources to calculate the cost of a cable company to deploy VoIP, and explained why this was proper." (D.I. 275 at 13). In addition, "even assuming that circuit switched telephon[y] would somehow be as profitable for Cablevision as VoIP[,] . . . Sprint can meet its burden by showing that Cablevision did not view circuit-switched voice services as equivalent to the patented VoIP services." (D.I. 275 at 13).

"To be deemed *acceptable*, the alleged acceptable noninfringing substitute must not have a disparately higher price than or possess characteristics significantly different from the patented product." *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991). "A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages." *Standard Havens Prods. v. Gencor Indus.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991). The testimony of Cablevision employees, cited by Dr. Mangum, suggests that Cablevision viewed VoIP as having many advantages over circuit-

10

switched telephony.⁶ This is enough to support Dr. Mangum's conclusion that circuit-switched telephony was not an available noninfringing alternative.

Regarding Dr. Mangum's assertion that circuit-switched telephony was significantly more expensive than VoIP, Dr. Mangum has explained his methodology and why it is appropriate in this case. Cablevision has not pointed to a fatal flaw in Dr. Mangum's approach. Cablevision's contentions here are a classic matter for cross examination.

### 3. Revenue from Unpatented Services

"Apportionment is required even for non-royalty forms of damages. If the application of the *Panduit* factors does not result in the separation of profits attributable to the patented device and the profits attributable to providing other aspects of the [product], it appears that apportionment is necessary." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067, 1073 (Fed. Cir. 2019) (citation omitted; cleaned up).

Cablevision makes an apportionment argument. It argues that I should exclude Dr. Mangum's lost profits opinion because it "assume[s] that Cablevision would purchase a whole suite of VoIP services, many unrelated to the Asserted Patents." (D.I. 248 at 13-14). Cablevision asserts that Dr. Mangum's opinion "ignores that Sprint was able to, and in fact had previously offered to, sell Cablevision PSTN-connectivity services separate from the many unpatented services included in its wholesale VoIP bundle." (*Id.* at 14). According to Sprint, Dr. Mangum's opinions in this case are "substantially similar" to those in *Charter* and,

---

⁶ In reply, Cablevision reprises its argument that the relevant "purchasers of the infringing product" are actually Cablevision's consumers, not Cablevision, and that Cablevision's consumers would not notice any difference between VoIP and circuit-switched service. (D.I. 296 at 7). This argument has little relevance because Dr. Mangum's theory is that Cablevision is the relevant consumer. The relevant inquiry is whether there were options that would have been viable noninfringing alternatives for Cablevision.

11

"Cablevision does not explain what facts in this case it believes are different than in *Charter*." (D.I. 275 at 14).

Much of my reasoning from *Charter* is applicable here. *See Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, 2021 WL 982732 at *12 (D. Del. Mar. 16, 2021). As in *Charter*, "Dr. Mangum's opinion is that no further apportionment is necessary, as Plaintiff would have profited from the entire sale of its wholesale VoIP services." (*Id.* at *13 (citations omitted)). His opinion is that the "entire sale" includes "convoyed" "ancillary" products. (D.I. 249-1, Ex. A ¶ 90). The parties dispute whether the ancillary products are convoyed sales. (D.I. 248 at 15). Cablevision's expert, Ms. Stamm, opines, "The record includes evidence that Sprint was willing to provide a far less complete set of 'bundled services' than that listed above." (D.I. 249-2, Ex. B ¶ 137). Sprint argues, "Dr. Mangum's opinions use the 'revenue' and 'ancillary revenue' numbers from Sprint's VoIP wholesale division, reflecting the revenue from the two products that this division actually sold." (D.I. 275 at 14). I agree with Sprint that this is fundamentally a disagreement between experts and that Cablevision's arguments "do not merit exclusion." (*Id.* at 15). As in *Charter*, the parties can dispute how the lost profit award should be apportioned through presentation of expert testimony and cross examination of the opposing party's experts.

### B. Reasonable Royalty

Cablevision argues that Dr. Mangum's reasonable royalty opinions should be excluded because his analytical method is not tied to the facts of the case and he impermissibly uses prior jury verdicts and settlements. (D.I. 248 at 16-20). The *Charter* defendants asserted similar arguments. In *Charter*, I allowed Dr. Mangum to proceed with his analytical method but excluded prior jury verdicts and settlements. 2021 WL 982732 at *8-12. I am not persuaded that Dr. Mangum's apportionment analysis, such as it is, complies with Federal Circuit law.

Regarding Dr. Mangum's analytical approach, Cablevision insists that there is a key difference between this case and *Charter* that should lead to a different outcome. According to Cablevision, in this case Dr. Mangum has made the fatal admission "that there are significant technological benefits of VoIP that have nothing to do with the patented inventions," whereas in *Charter* Dr. Mangum only asserted, "the major difference between the two systems [*i.e.*, VoIP and circuit-switched technology] is that one, VoIP, is cheaper to deploy." (D.I. 248 at 17 (cleaned up)). Because of this admission, Dr. Mangum "was required to isolate the incremental amount of any profit differential attributable to the patented inventions as opposed to other aspects of VoIP." (*Id.* (citing *VirnetX v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014))).

Sprint maintains that Dr. Mangum's approach in this case is "substantially similar" to his approach in *Charter*. (D.I. 275 at 16). Sprint argues, "Cablevision does not point to any fact on this issue as meaningfully different from the *Charter* case, nor could it." (*Id.*).

I am not persuaded by Sprint, but, based on the present record, I cannot exclude Dr. Mangum's reasonable royalty analysis either. The "admission" Cablevision points to is deep within Dr. Mangum's deposition. (D.I. 249-2, Ex. F, 139:15-142:16). Dr. Mangum's theory appears to be that although there are cost savings associated with unpatented features of VoIP, the patented features have a complimentary relationship with the unpatented features such that the unpatented features would not be sold without the patented features. (*See id.* at 144:19-21 ("I don't think there are profits that can be earned by saying we can sell VoIP without connecting to the PSTN"); D.I. 276-1, Ex. A ¶ 206 ("For these reasons, it is my opinion that it does not make economic sense to separately 'apportion out' the value of all-IP calls that do not touch the PSTN, such as by calculating the percentage of calls placed, or minutes spent on calls, that are all-IP and multiplying that percentage into a damages calculation.")). The difficulty with Dr. Mangum's

13

analysis is that apportionment is not dependent on "economic sense." In many multi-component products, there are numerous parts that are necessary for the product to be useful and therefore worth something. No one would sell the product without its numerous necessary parts. But it does not follow that the value of each necessary part is the same as the value of the whole. And yet that is what it appears that Dr. Mangum is doing. The service Sprint sold did at least two things. It allowed VoIP to VoIP calls and PSTN to VoIP (or VoIP to PSTN) calls. Thus, the service Sprint sold provided for unpatented calls (the first category) and for patented calls (the second category). And, in the second category, Sprint did not invent either PSTN or VoIP. What Sprint did invent was the ability of PSTN and VoIP to connect to each other. I do not see that Dr. Mangum apportioned for any of this. But I could be wrong about that. The briefing on this issue (as with many of the other issues in this case) is not very helpful because the parties raise a plethora of issues and then address them in a fairly conclusory fashion. Thus, while I am going to deny the *Daubert* motion on Dr. Mangum's apportionment in the reasonable royalty opinion, I am going to hold a hearing at which Dr. Mangum can testify and be cross-examined. I will then permit a further motion and briefing sufficient to permit me to render an informed decision on this issue.

I note that Dr. Mangum opined, citing to depositions, "I understand Defendant only considered telephony solutions that could connect to the PSTN." (D.I. 276-1, Ex. A ¶ 206). Dr. Mangum then explained, "Defendant, through the use of the patented technology, was able to develop and offer the two products, i.e., a system with [infringing] PSTN connection functionality and a system with [noninfringing] IP-IP calling, in one. . . . The technological efficiencies of IP calling do not result in a product that Defendant can charge consumers for unless that IP network can also make calls to and from the PSTN." (*Id.* ¶ 207). The problem

14

with this theory is, I think, that it applies in reverse too. That is, Sprint could not sell a service unless it also offered the noninfringing IP-IP calling. Thus, I am not convinced that Dr. Mangum's theory is sufficiently "grounded in the specific facts of the case." *Virnetx*, 767 F.3d at 1331.

Cablevision also argues that Dr. Mangum's royalty rate should be excluded because it is based upon (1) prior jury verdicts and settlements and (2) an email exchange in which Sprint offered Suddenlink a license to its VoIP portfolio, which Suddenlink declined. (D.I. 248 at 19-20). I excluded Dr. Mangum's opinions relying on jury verdicts and settlements in *Charter*, and both parties agree that the issues here are the same. (*Id.* at 19; D.I. 275 at 18 ("Recognizing that the Court rejected Sprint's arguments on this issue in *Charter*, to preserve the issue Sprint respectfully contends that this Court should not exclude prior verdicts and settlements in this case for the following reasons that were also present in *Charter* . . . .")). As in *Charter*, I find that the jury verdicts and settlement agreements relied upon by Dr. Mangum are of minimal probative value in determining the results of a hypothetical negotiation. 2021 WL 982732 at *8-10. A jury verdict represents an informed lay opinion on the results of a hypothetical negotiation between the parties. "An informed lay opinion is not a reliable basis for determining the reasonable royalty rate that a hypothetical negotiation would reach." *Id.* at *9. Settlements likewise fail to offer reliable evidence of a hypothetical negotiation because they are "not comparable to a negotiation between two willing parties." *Id.* at *10.

Since I am excluding the prior jury verdicts and settlements, I will not address Cablevision's argument regarding the Suddenlink licensing proposal email. Sprint states in its briefing, "Sprint acknowledges that past verdicts and settlements are at the heart of Dr. Mangum's $1.37 rate. Thus, if the Court excludes past verdicts and settlements as in *Charter*,

15

Sprint does not intend to argue that the $1.37 rate is nonetheless sufficiently supported by the 2013 Suddenlink licensing proposal alone." (D.I. 275 at 19).

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED with respect to Dr. Mangum's reliance on prior jury verdicts and settlements and Dr. Wicker's "blocking patents" opinion. Defendants' motion is otherwise DENIED. A Daubert hearing limited to the identified issues will be scheduled.

An appropriate order will issue.