# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., <br><br> Plaintiff, <br><br> v. <br><br> CEQUEL COMMUNICATIONS, LLC D/B/A SUDDENLINK COMMUNICATIONS AND CSC HOLDINGS, LLC D/B/A/ OPTIMUM-CABLEVISION, <br><br> Defendants. | C.A. No. 18-1752-RGA <br><br> **PUBLIC VERSION** |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR RENEWED *DAUBERT* MOTION TO EXCLUDE RUSSELL W. MANGUM'S REASONABLE ROYALTY OPINION**

OF COUNSEL:
Mark L. Levine
Brian C. Swanson
Tulsi E. Gaonkar
Luke C. Beasley
Bartlit Beck LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
(312) 494-4400
mark.levine@bartlitbeck.com
brian.swanson@bartlitbeck.com
tulsi.gaonkar@bartlitbeck.com
luke.beasley@bartlitbeck.com

Lindley J. Brenza
Bartlit Beck LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
(303) 592-3100
lindley.brenza@bartlitbeck.com

Dated: March 25, 2022

Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com
ewing@rlf.com

*Attorneys for Defendants*
*Cequel Communications, LLC d/b/a*
*Suddenlink Communications and*
*CSC Holdings, LLC d/b/a Optimum-*
*Cablevision*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

I.      Defendants' Accused Systems............................................................................... 1

II.     Dr. Mangum's Damages Models and Defendants' *Daubert* Attack................... 2

III.    The Hearing on Dr. Mangum's Analytical Approach .......................................... 3

LEGAL STANDARD............................................................................................................... 5

ARGUMENT............................................................................................................................ 6

I.      Dr. Mangum's Analytical Approach Must Be Excluded Because It Fails to
        Comply With Settled Law Requiring Apportionment .......................................... 6

        A.      Dr. Mangum's Calculated "Profit Premium" Is Driven By the Lower Cost of
                Providing VoIP Telephony ........................................................................ 7

        B.      The Profit Premium Between VoIP Telephony and Circuit-Switched Telephony
                Does Not Flow Solely, or Even Primarily, From the Asserted Patents .................. 7

II.     Dr. Mangum's Assertion That He Considered Apportionment Fails ................... 9

        A.      The Marketability of VoIP Telephony Is Not the Equivalent of Apportionment ... 9

        B.      Dr. Mangum's Other Attempts to Avoid Apportionment Fail ............................. 11

CONCLUSION........................................................................................................................ 12

# TABLE OF AUTHORITIES

**Cases**

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
    809 F.3d 1295 (Fed. Cir. 2015) ................................................................................... 5, 6, 8

*Ericsson, Inc. v. D–Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ................................................................................... 5, 6, 8

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ........................................................................................ 10

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ............................................................................................. 9

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ................................................................................ 1, 6, 10

**Statutes**

USC § 284 ...................................................................................................................... 5

## INTRODUCTION

"No matter what the form of the royalty" sought by a patentee in litigation, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citation omitted). Sprint's damages expert Dr. Russell Mangum, however, did not do so. He ignored this bedrock requirement in his "analytical approach" to calculating royalties. Instead, after estimating what he calls the "profit premium" between voice-over-IP ("VoIP") telephony and circuit-switched telephony, Dr. Mangum awarded the entirety of that premium to Sprint as a royalty for the Christie patents, which relate solely to connecting IP calls to the PSTN. He did not apportion or even consider the many other technologies not connected to the Christie patents that make a VoIP system's costs lower—and profits higher. As a result, his damages model would improperly reward Sprint with royalties that include the technical advances of others.

In its initial *Daubert* ruling, the Court raised concerns with Dr. Mangum's analytical approach, and sought testimony and additional evidence regarding his analysis and whether he apportioned between patented and unpatented services—and if not, why not. At the hearing, Dr. Mangum doubled down on his erroneous profit premium calculation and his refusal to apportion between features related to the Christie patents and technology not so related. As a result, Dr. Mangum's opinions with respect to his analytical approach are unreliable, contrary to well-established law, and should be excluded.

## BACKGROUND

I. **Defendants' Accused Systems**

Sprint accuses Defendants' VoIP cable networks of infringing nine different patents across two patent families: the "Christie Patents" (so named after their shared inventor, Joseph

1

Christie) and "Enhanced Services Patents." *See generally* D.I. 1. This motion concerns only the Christie Patents.

The accused networks that allegedly infringe these patents facilitate two types of calls: (1) IP-to-IP calls and (2) IP-to-PSTN (and vice versa) calls. The Christie Patents relate only the IP-to-PSTN category of calls. *See* Ex. A, Mangum Dep. Tr. 108:7-14; Ex. B, 3/7/2022 Hr'g Tr. 32:4-7. The Christie patents do not cover IP-to-IP calls or VoIP more generally. Ex. B, 3/7/2022 Hr'g Tr. 32:23-33:9.

## II. Dr. Mangum's Damages Models and Defendants' *Daubert* Attack

Dr. Mangum offered three different damages models: (1) lost profits, (2) analytical approach royalties, and (3) hypothetical negotiation royalties. Defendants moved to exclude all three as unreliable. *See generally* D.I. 248. The Court ruled on the first and third models, while the second is the subject of this renewed motion.[1]

In its initial decision, the Court expressed doubt that Dr. Mangum's refusal to apportion in his analytical approach royalties was consistent with prevailing Federal Circuit law. It observed that "Dr. Mangum's theory appears to be that although there are cost savings associated with unpatented features of VoIP, . . . the unpatented features would not be sold without the patented features." *Id.* at 13. The Court reasoned:

> The difficulty with Dr. Mangum's analysis is that apportionment is not dependent on 'economic sense.' In many multi-component products, there are numerous parts that are necessary for the product to be useful and therefore worth something. No one would sell the product without its numerous necessary parts. But it does not follow that the value of each necessary part is the same as the value of the whole. And yet that is what it appears that Dr. Mangum is doing. The

---

[1] As to Dr. Mangum's lost profits opinions—which cover all sales and therefore do not include any mixed award with royalties, *Id.* at 26:23-27:17; Ex. C, Mangum Rpt. ¶ 97, Ex. 4—the Court held that Dr. Mangum's opinions were sufficient to survive Defendant's *Daubert* challenge. D.I. 324 at 4-12. As to the hypothetical negotiation royalties, the Court ruled that Dr. Mangum could not rely on prior verdicts and settlements in calculating a reasonable royalty within that framework. *Id.* at 15-16.

>   service Sprint sold did at least two things. It allowed VoIP to VoIP calls and PSTN to VoIP (or VoIP to PSTN) calls. Thus, the service Sprint sold provided for unpatented calls (the first category) and for patented calls (the second category). And, in the second category, Sprint did not invent either PSTN or VoIP. What Sprint did invent was the ability of PSTN and VoIP to connect to each other. I do not see that Dr. Mangum apportioned for any of this.

*Id.* at 13-14.

The Court elaborated on the inconsistency inherent in Dr. Mangum's explanation for his decision not to apportion (or even attempt to apportion) for the value of noninfringing IP-IP calls. The Court quoted Dr. Mangum's report that "[t]he technological efficiencies of IP calling do not result in a product that Defendant can charge consumers for unless that IP network can also make calls to and from the PSTN." D.I. 324 at 14 (quoting Mangum Rpt. ¶ 207). It then reasoned: "The problem with this theory is, I think, that it applies in reverse too. That is, Sprint could not sell a service unless it also offered the noninfringing IP-IP calling." *Id.* at 14-15. Consequently, the Court was "not convinced that Dr. Mangum's theory is sufficiently grounded in the specific facts of the case." *Id.* at 15 (citation omitted).

To flesh out these issues, the Court ordered a hearing to permit Dr. Mangum to testify, along with additional "briefing sufficient to permit [the Court] to render an informed decision on this issue." *Id.* at 14. The hearing was held on March 7, 2022.

### III. The Hearing on Dr. Mangum's Analytical Approach

For his analytical approach, Dr. Mangum calculated the profit per subscriber per month for a traditional circuit-switched telephony (the encircled figure on the right below) and subtracted that from what he calculated to be the profit per subscriber per month for VoIP telephony (the encircled figure on the left below). This math yielded what Dr. Mangum calls a "profit premium" of $3.32 per subscriber per month that, according to him, should be awarded entirely to Sprint as a royalty on the Christie Patents. Ex. B, 3/7/2022 Hr'g Tr. 29:6-16.

3

According to Dr. Mangum, the entire profit differential between traditional circuit-switched telephony and VoIP telephony is attributable to the patents, and only to the patents. *Id.* at 15:10-14.



Ex. D, Sprint Presentation at 3/7/2022 Hr'g, Slide 12.

As depicted in the graphic above, and as Dr. Mangum testified to at the hearing, the principal reason for this "profit premium" is that the cost per subscriber per month of providing VoIP telephony is roughly half of what it is to provide circuit-switched telephony:

> Q. Right. The reason you have a profit premium that's bigger with VoIP than [what] you get with the circuit switch on the right is that with VoIP the costs are a lot lower; right?
>
> A. It is cost, yes, that's driving this.

Ex. B, 3/7/2022 Hr'g Tr. 42:19-23.

Dr. Mangum conceded that the costs of providing the VoIP network included items unrelated to the Christie Patents—like soft switches, media controllers, and servers. *Id.* at 43:12-

4

15. He then explained that if the cost of those items fluctuated, he would impute that change wholly to the asserted patents:

> Q. So, if someone came up with some new routers and servers that, let's say, they used a different material, and it's just way cheaper to make the routers and servers. In that situation, the profit premium would go up. And under your analysis, all of that would be attributed to the Christie patents; right?
>
> A. Yes. If the value related to the technical VoIP delivery was lower, then that would mean that there's more profit, lower through costs, then there would be more profit left over, and that would be calculated through the analytical approach.

*Id.* at 44:7-17.

Indeed, Dr. Mangum went even further, stating that, *no matter* the source of the cost savings, he would hand all of that savings to Sprint as a royalty:

> Q. Anything that's done to lower costs of the VoIP system is something that in your analytical approach analysis is included a hundred percent as a royalty, isn't it?
>
> A. If costs are lower, yes. That means the market value of what's needed to deliver this, if the market value of these other things go down, that leaves more profit for somebody offering up the VoIP system, yes.

*Id.* at 46:1-8. As explained below, a damages model that would (handsomely) reward Sprint for the technical advances of others is flawed.

## LEGAL STANDARD

"Under § 284 [of the United States Code], damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'" *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quoting *Ericsson, Inc. v. D–Link Sys., Inc.,* 773 F.3d 1201, 1226 (Fed. Cir. 2014)). Thus, "[w]hen the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features."

5

*Ericsson*, 773 F.3d at 1226. *Ericsson* explains that an economist "could do this in various ways," including "by careful selection of the royalty base to reflect the value added by the patented feature," or "by adjustment of the royalty rate so as to discount the value of a product's non-patented features." *Id.* How to apportion may vary; the requirement to do so does not. "As we have repeatedly held, the essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Commonwealth*, 809 F.3d at 1301 (citation omitted).

A patentee is not relieved of this burden simply because the patented services are rarely sold without unpatented ones, or because unbundling the profit attributable to each is difficult to do with precision. To the contrary, apportionment is required even where a party can prove that the patented feature is "valuable, important, or even essential to the use of the" overall product. *VirnetX*, 767 F.3d at 1326–27.

## ARGUMENT

### I. Dr. Mangum's Analytical Approach Must Be Excluded Because It Fails to Comply With Settled Law Requiring Apportionment

Dr. Mangum's analytical approach improperly fails to distinguish the alleged value of the Christie patents from the myriad unpatented services and technologies that drive the value of commercial voice telephony. At the *Daubert* hearing, Dr. Mangum confirmed that he attributed 100% of any profit difference between VoIP telephony and circuit-switched telephony to the asserted patents. Dr. Mangum's excuse for doing so—that VoIP telephony would not be marketable to consumers without the connection to the PSTN—does not justify his refusal to apportion the amount of the profit premium attributable to the Christie Patents.

### A. Dr. Mangum's Calculated "Profit Premium" Is Driven By the Lower Cost of Providing VoIP Telephony

During Dr. Mangum's direct examination, Sprint displayed a slide showing the "Capex per Subscriber Month" for VoIP telephony was $2.55 compared to $5.02 per month for circuit-switch telephony. That $2.47 cost difference accounts for nearly 75% of Dr. Mangum's $3.32 profit premium.



Ex. D, Sprint Presentation at 3/7/2022 Hr'g, Slide 12. Dr. Mangum conceded that the cost savings achieved through VoIP telephony as compared to circuit-switched telephony was "driving" the profit premium. Ex. B, 3/7/2022 Hr'g Tr. 42:19-23. The royalty under his analytical approach model is the entire profit premium. *Id.* at 29:17-23.

### B. The Profit Premium Between VoIP Telephony and Circuit-Switched Telephony Does Not Flow Solely, or Even Primarily, From the Asserted Patents

The Christie Patents do not cover VoIP telephony generally, much less all of its component parts. In his analysis, Dr. Mangum relied on Sprint's technical expert, Dr. Wicker. *Id.* at 40:9-15. Dr. Wicker conceded, as he must, that many elements of a voice-over-IP network are not covered by the Christie Patents. (Ex. E, Wicker Dep. Tr. 271:11-20). Dr. Wicker agreed that the Christie Patents do not cover most of the components of a VoIP network, including:

- fiber, *id.* at 271:21-272:8;

- routers, which are a "significant expense for a Voice Over IP company," *id.* at 272:21-273:5;

- multimedia terminal adapters (or "MTAs"), another "significant expense" for VoIP providers, *id.* at 273:6-20;

- media gateways, which are "expensive devices," *id.* at 273:21-274:4;

7

- soft switches, additional "large expenses" that can be used "in ways that are not relevant to the patents at issue," *id.* at 274:10-16; and

- voicemail servers, *id.* at 275:16-24.

Dr. Mangum acknowledged "VoIP's ability to use bandwidth more efficiently," and cost savings "related to packetized delivery as opposed to circuit switched." Ex. A, Mangum Dep. Tr. 141:2-142:6. But he did not attempt to apportion out the profit premium due to a reduction in the cost of unpatented components of VoIP telephony. He confirmed at the *Daubert* hearing that if the cost of items like routers, servers, and other infrastructure necessary to deliver VoIP telephony were lower, he would include those savings in the royalty for the Christie Patents, agreeing that "all of that would be attributed to the Christie patents." *Id.* at 44:7-17. Dr. Mangum further agreed that under his methodology, "anything that's done to lower the costs of the VoIP system" is "included a hundred percent as a royalty" because the "costs are lower." *Id.* at 46:1-8.

Dr. Mangum's assigning the entirety of a VoIP network's cost reduction as the royalty for the Christie Patents—which cover only the connection to PSTN networks—is inconsistent with Federal Circuit law. "'[T]he essential requirement' for reliability under *Daubert* 'is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.'" *Commonwealth*, 809 F.3d at 1301 (quoting *Ericsson,* 773 F.3d at 1226). "When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features." *Ericsson*, 773 F.3d at 1226. Dr. Mangum did not even attempt to determine the value added by the Christie Patents in addition to the other features of VoIP.

8

## II. Dr. Mangum's Assertion That He Considered Apportionment Fails

At the *Daubert* hearing, Dr. Mangum insisted that he considered apportionment but did not believe it was appropriate. The reasons he offered for failing to apportion do not pass muster.

### A. The Marketability of VoIP Telephony Is Not the Equivalent of Apportionment

Dr. Mangum claimed that there was "nothing to apportion out" because there can be no profits earned by selling VoIP "without connecting to the PSTN." Ex. A, Mangum Dep. Tr. 144:7-145:8. He contends that VoIP telephony is marketable only if it practices the Christie Patents and links VoIP to PSTNs. *Id*. at 142:6-14; 147:17-148:3; Ex. B, 3/7/2022 Hr'g Tr. 32:8-22. As Dr. Mangum put it at the hearing, it is his "opinion from the evidence in this case that the cable companies were only looking for a solution that included connection to a PSTN." Ex. B, 3/7/2022 Hr'g Tr. 37:7-15. But other technologies not related to the Christie patents are also necessary or required for a VoIP system to work or function. Dr. Mangum agreed that "you need to have this VoIP packet technology" for "the system to work." *Id*. at 39:14-17. Sprint's technical expert, on whom Dr. Mangum relied, admitted that the various components of a VoIP network that are not covered by the Christie patents, such as a media gateway controller, are necessary for a VoIP system to work. Ex. E, Wicker Dep. Tr. 274:1-9.

Courts have routinely rejected Dr. Mangum's argument about the patented technology being required to make a system work where other unpatented technologies are also required. This very issue routinely arises in the context of multi-component cases and the application of the "entire market value rule." In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012), LaserDynamics claimed it was entitled to a 2% cut of Quanta's laptop computer sales, "calculated as a percentage of the entire market value of a laptop computer rather than a patent-practicing [optical disc drive] alone." *Id.* The Court rejected the very argument Dr.

9

Mangum now makes—that without the patented feature, the product would not be commercially marketable:

> It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer. ***Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be commercially unviable***. Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product. To name a few, a high resolution screen, responsive keyboard, fast wireless network receiver, and extended-life battery are all in a sense important or essential features to a laptop computer; take away one of these features and consumers are unlikely to select such a laptop computer in the marketplace. ***But proof that consumers would not want a laptop computer without such features is not tantamount to proof that any one of those features alone drives the market for laptop computers***.

*Id.* at 68 (emphasis added). *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310 (Fed. Cir. 2018) ("Whether viewed as valuable, important, or even essential, the patented featured must be separated.") (quoting *VirnetX*, 767 F.3d at 1329) (citation omitted).

Dr. Mangum's opinion that the connection of VoIP to PSTNs made the accused system marketable ignores the fact that there was demand for unpatented IP-to-IP calls, even if the combination of IP-to-IP calls and IP-to-PSTN calls was necessary for marketability. Dr. Mangum admitted that he is not aware of any VoIP system that offered just the IP-to-PSTN calls without the IP-to-IP calls. Ex. B, 3/7/2022 Hr'g Tr. 37:22-38:4. As the Court noted in its initial *Daubert* opinion: "The problem with [Dr. Mangum's] theory is, I think, that it applies in reverse too. That is, Sprint could not sell a service unless it also offered the noninfringing IP-IP calling." D.I. 324 at 14-15. Sprint had the opportunity to address the Court's well-founded concerns. It failed to do so.

Dr. Mangum's attempt to distinguish the "multi-component" cases on the ground that multi-component product analysis concerns revenues, whereas this case "isn't a revenue case" but rather "is about profits" is untenable. Ex. B, 3/7/2022 Hr'g Tr. 15:15-16:14. As Dr. Mangum

10

conceded in cross examination, profits are not divorced from revenue but are based on revenue minus costs. *Id.* at 29:17-30:14. Read against controlling precedent, Dr. Mangum's rationale for not apportioning his profit premium fails.

### B. Dr. Mangum's Other Attempts to Avoid Apportionment Fail

Dr. Mangum's claim that his profit premium calculation implicitly accounted for certain other apportionment considerations does not cure his refusal to apportion *any* of the profit premium between patented and unpatented services. Ex. D, Sprint Presentation at 3/7/2022 Hr'g, Slides 14-18.

*First*, Dr. Mangum testified that his profit premium calculation accounts for the cost savings of providing VoIP telephony. Ex. B, 3/7/2022 Hr'g Tr. 13:19-15:14. He said, for example, that the "lower Capex per month" owes in part to the fact that circuit-switched "infrastructures already existed," meaning Defendants "wouldn't have that expenditure to do that again." *Id.* at 14:16-15:14. At most, this is one of many reasons that VoIP telephony is cheaper than circuit-switched—and thus one of many reasons why the profit for VoIP telephony is higher. And this lower cost applies to IP-to-IP calls just as much as IP-to-PSTN calls. It is a benefit of using VoIP generally. As explained above, Dr. Mangum did not apportion for changes in the costs of the VoIP system. *Id.* at 43:6-44:6 (agreeing that even "the entirety of the decrease in the costs of . . . routers and servers, et cetera, would build into the profit premium").

*Second*, Dr. Mangum claims he has already apportioned for the cost savings of certain VoIP telephony equipment, because the "incremental profitability, it already takes out, for example, those amounts of hardware that's involved when it's delivering them." *Id.* at 16:9-25. But Defendants' objection to Dr. Mangum's methodology is not that he calculated profit by subtracting costs from revenue; it's that he assumed without a proper basis that the resulting profit figure should be "apportioned" entirely to Sprint as a reasonable royalty for the patented

11

services. To the extent that VoIP costs less because of technology or cost savings having zero connection to the Christie patents, it *must* be apportioned out of any reasonable royalty. Here, Dr. Mangum did no such thing.

*Third*, Dr. Mangum defended his profit premium on the ground that it was calculated using "comparable features," *i.e.*, "looking at essentially an apples-to-apples comparison except for the patented technology." *Id.* at 17:6-22. By this he means he compared circuit-switched and VoIP telephony's delivery of "local calling, toll calling, long distances, caller ID. . . . comparing two things that those were all the same." *Id.* at 18:1-9. This is beside the point. It does not cure his failure to apportion cost savings, which he admits drive his profit premium. And it does not explain his refusal to isolate for the additive value of the patented services themselves, even though VoIP telephony delivers additional unpatented services (*e.g.* IP-to-IP calling) that circuit-switched telephony does not.

*Finally*, Dr. Mangum explained why two other considerations—the power source used for VoIP telephony and whether VoIP users also have a landline—did not feature significantly in his analytical approach analysis. *Id.* at 18:10-20:12. As with much else Dr. Mangum testified to, this does nothing to explain why Dr. Mangum did not apportion costs, the driver of the profit premium.

## CONCLUSION

Defendants respectfully request that the Court grant this motion to exclude Dr. Mangum's opinion on reasonable royalties based on the analytical approach.

OF COUNSEL:
Mark L. Levine
Brian C. Swanson
Tulsi E. Gaonkar
Luke C. Beasley
Bartlit Beck LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
(312) 494-4400
mark.levin@bartlitbeck.com
brian.swanson@bartlitbeck.com
tulsi.gaonkar@bartlitbeck.com
luke.beasley@bartlitbeck.com

Lindley J. Brenza
Bartlit Beck LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
(303) 592-3100
lindley.brenza@bartlitbeck.com

Dated: March 25, 2022

/s/ Jason J. Rawnsley
Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com
ewing@rlf.com

*Attorneys for Defendants Cequel Communications, LLC d/b/a Suddenlink Communications and CSC Holdings, LLC d/b/a Optimum-Cablevision*

13

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 25, 2022, upon the following Plaintiffs' counsel in the manner indicated:

B. Trent Webb *VIA ELECTRONIC MAIL*
Aaron E. Hankel
Ryan D. Dykal
Ryan J. Schletzbaum
Jordan T. Bergsten
Lauren Douville
Mark D. Schafer
Samuel J. LaRoque
Maxwell C. McGraw
Lydia C. Raw
John D. Garretson
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108
816-474-6550
SprintTeam@shb.com

Robert H. Reckers *VIA ELECTRONIC MAIL*
Michael W. Gray
Jonathan M. Hernandez
SHOOK, HARDY & BACON LLP
JP Morgan Chase Tower
600 Travis Street, Suite 3400
Houston, TX 77002-2926
713-237-8008
SprintTeam@shb.com

2

Stephen J. Kraftschik  
Christina B. Vavala  
POLSINELLI PC  
222 Delaware Avenue, Suite 1101  
Wilmington, DE 19801  
302-0252-0924  
skraftschik@polsinelli.com  
cvavala@polsinelli.com  

*VIA ELECTRONIC MAIL*

                */s/ Jason J. Rawnsley*  
                Jason J. Rawnsley (#5379)